he would hold a 0.83% ownership position in DHT. Investor-Employee 11 was also told that he would be offered a warrant, which would result in an additional 0.96% ownership position. Further stock options made available to him would result in an additional 0.50% ownership position. According to Investor-Employee's agreement, this would result in a total ownership position of 1.46%.

195.   In approximately April 2015, Investor-Employee 11 attended a meeting at the 3si headquarters in Burlington, Massachusetts. The 3si headquarters occupied a single section of one floor in the building. Although the purpose of the meeting was to discuss software, no software was presented at the meeting. At the meeting, Investor-Employee 11 learned 3si did not own any patents or intellectual property.

196.   In June 2015, Investor-Employee 11 attended a meeting in Nashville, Tennessee. The purpose of this meeting was to observe a presentation for a 3si product. During this meeting, the presenter informed attendees that he had never used the product but that the product was being used in a VA hospital in the Boston area. The presenter informed attendees that the product was in the "Alpha" stage of development. A member of the Management Team instructed Investor-Employee 11 and other employees to sell the concept of the product. The member of the Management Team stated that the first employee to successfully sell the 3si concept would receive a $10,000 bonus.

197.   During his employment at DHT, Investor-Employee 11 received several complaints from employees. Many of the complaints concerned DHT's failure to pay them in a timely fashion. Investor-Employee 11 forwarded these complaints to a member of the Management Team and was told that these issues would be resolved if DHT hired more Investor-Employees.

31

198. In approximately May 2015, Investor-Employee 11 asked for the locations of the beta sites. Investor-Employee 11 never received a response.

199. In or about July 2015, Investor-Employee 11 learned that DHT would not make payroll. Nevertheless, Investor-Employee 11 still felt pressure from the Management Team to recruit new Investor-Employees.

200. While employed at DHT, Investor-Employee 11 learned that an agreement between DHT, IME, and Mercury Biomed had failed due to DHT's inability to provide adequate financing.

201. Investor-Employee 11 subsequently demanded financial information from Wagner and the Management Team. In response, he was told that DHT had enough cash to sustain its operations and also had interested foreign investors.

202. On August 22, 2015, a member of the Management Team terminated Investor-Employee 11 over the telephone. The member of the Management Team explained that the company was reorganizing and did not have enough money to pay him.

203. After the termination, Investor-Employee 11 received a two-year promissory note, a nondisclosure agreement, and a release.

204. Investor-Employee 11 was paid through July 15, 2015, however, an additional $50,000 in salary and expenses was not paid.

205. Investor-Employee 11 never recovered his original $250,000 investment.

**l. Investor-Employee 12**

206. Investor-Employee 12, a Massachusetts resident, formerly served as the Vice President of Business Development for the Mid-South Region of DHT.

207. On or about April 2015, a member of the Management Team contacted Investor-

Employee 12 and offered him the position of Vice President of Business Development in exchange for a .83% ownership interest in DHT and a $250,000 investment.

208.    In approximately April 2015, Investor-Employee 11 accepted an offer of employment and agreed to invest $250,000 in DHT.

209.    In return for his investment, Investor-Employee 12 was told he would have a .83% ownership interest in DHT.

210.    After less than three months on the job, Investor-Employee 12 requested a full refund of his investment.

211.    On August of 2015, Investor-Employee 12 was terminated.

212.    After the termination, Investor-Employee 12 received a promissory note stating that the Downing Companies would pay back his investment by November 12, 2015.

### m. Investor-Employee 13

213.    Investor-Employee 13, a Pennsylvania resident, formerly served as the Vice President of Business Development for DDHG in the Northeast Region.

214.    In approximately September 2014, a member of the Management Team offered Investor-Employee 13 the Vice President of Business Development position and a .5% ownership interest in DDHG in exchange for an investment of $150,000.

215.    Investor-Employee 13 was offered an annual salary of $215,000 and was informed that he would be participating in the annual performance bonus program. He was informed that $25,0000 of the bonus was guaranteed.

216.    On September 14, 2014, Investor-Employee 13 accepted an offer of employment and agreed to invest $150,000 in DDHG.

217.    In return for Investor-Employee 13's investment in DDHG, he was informed that

he would hold a 0.5% ownership interest in DDHG. Investor-Employee 13 was further informed that he could purchase an additional 9,390 shares at $10.65 per share.

218.    Prior to making his investment, Investor-Employee 13 informed Wagner and the Management Team that he was in a financially fragile situation.

219.    On April 30, 2015, Investor-Employee 13 was promoted to Executive Vice President of Client Services at 3si.

220.    After Investor-Employee 13 stopped receiving a regular paycheck, he sent an e-mail to Wagner stating that his investment in DDHG and DDHG's subsequent failure to pay him had adversely affected his already fragile financial situation. Investor-Employee 13 then requested that DDHG pay him all of his outstanding salary. Investor-Employee 13 received no response to this e-mail.

221.    Investor-Employee 13 then sent another e-mail to a member of the Management Team. In this e-mail, Investor-Employee 13 stated that DDHG's failure to pay him on time had caused him to be unable to pay his mortgage and his daughter's high school tuition payments.

222.    On December 11, 2015, the Downing Companies terminated Investor-Employee 13.

### n.  Investor-Employee 14

223.    Investor-Employee 14, a Colorado resident, formerly served as the Vice President of Business Development for DDHG.

224.    On or about June 2014, a recruiter contacted Investor-Employee 14 regarding the position of Vice President of Business Development for DDHG.

225.    The recruiter required Investor-Employee 14 to sign a document attesting to the

fact that he had $250,000 in cash. The recruiter informed him that this attestation was a condition of Investor-Employee 14's introduction to DDHG.

226.    On June 18, 2014, a member of the Management Time met with Investor-Employee 14 and offered the position of Vice President of Business Development and a .08% ownership interest in exchange for a $250,000 investment.

227.    The member of the Management Team told Investor-Employee 14 that 3si, Surgerylink, IRX, Carelink, 360, Flex Life ("FlexLife"), and Magaw Medical ("Magaw Medical") produced earnings of over $100 million annually.

228. The member of the Management Team also told Investor-Employee 14 that DDHG owned 70% of 3si, that Flex Life had produced a prototype, and that Magaw Medical had an actual product.

229.    On June 20, 2014, Investor-Employee 14 received an offer letter from a member of the Management Team indicating that his annual salary would be $150,000.

230.    On or about July 3, 2014, Investor-Employee 14 accepted an offer of employment and agreed to invest $250,000 in DDHG.

231.    Investor-Employee 14 was informed that in return for his investment, he would receive an ownership interest in DDHG.

232.    On September 5, 2014, Investor-Employee 14 was promoted to Chief Development Officer of DDHG. His offer letter indicated his annual salary would be increased to $200,000 and he would participate in a commission plan.

233.    On September 5, 2014 Investor-Employee 14 was informed that he would be offered stock options in DDHG for an additional 1.0% ownership.

234.    During Investor-Employee 14's employment he learned that FlexLife had no

product.

235.    During Investor-Employee 14's employment, he requested financial information for DDHG, but the requested information was not provided.

236.    On December 3, 2015, Investor-Employee 14 resigned from DDHG.

237.    Subsequently, Investor-Employee 14 received a promissory note for his original $250,000 investment and a payment of $45,000.

238.    On December 23, 2015, Investor-Employee 14 signed a repurchase agreement to sell back his ownership stake to the Downing Companies.

### o.   Investor-Employee 15

239.    Investor-Employee 15, an Ohio resident, first served as the Chief Development Officer and later as Vice President of Business Development for DDHG.

240.    In approximately September 2014, a member of the Management Team told Investor-Employee 15 that an investment of funds was a condition of employment.

241.    Investor-Employee 15 spoke with at least two different members of the Management Team prior to his investment. One member told him that DDHG had developed technologically advanced products that the company intended to sell. Another member told him that revenues or AUM could not be disclosed due to a nondisclosure agreement.

242.    Both members of the Management Team told Investor-Employee 15 that Wagner owned 100% of Medrobotics which was valued at over $300 million. In fact, Wagner owned less than 1% of Medrobotics.

243.    On September 25, 2014, Investor-Employee 15 received a slide which included a "return on capital" spreadsheet. Investor-Employee 15 relied on this spreadsheet in

making his investment in the Downing Companies. Investor 15 specifically relied on the representation that 3si had received a $9 million investment.

244.    On September 26, 2014, a slide deck was sent to Investor-Employee 15 that included a chart listing companies owned by DDHG. EHR and Clinical Workflow were among the companies listed as being owned by DDHG. Upon information and belief, the current value of EHR and Clinical Workflow was overstated.

Additionally, upon information and belief the exit value was also significantly overstated. The slide deck also claimed that Downing had an exit value of $9.5 million.

245.    Investor-Employee 15 was offered an annual salary of $225,000 and was informed that he would be participating in a commission plan.

246.    On October 6, 2014, Investor-Employee 15 accepted the offer of employment and agreed to invest $250,000 in DDHG.

247.    This $250,000 represented the majority of Investor-Employee 15's life savings.

248.    In return for Investor-Employee 15's investment, he was informed that he would hold an ownership position of 0.833% in DDHG. Additionally, he was informed that he would have options, which upon vesting, would result in additional 0.833%. As a result, Investor-Employee would have a total ownership position of 1.67%.

249.    Investor-Employee 15 was to be paid on the 15th and 30th of each month. On November 15, 2014, DDHG failed to pay Investor-Employee 15. Investor-Employee contacted a member of the Management Team regarding the missed payment and was told that there were "huge paycheck issues at DDHG."

250.    Although Investor-Employee 15 received his November 2014 and December 2014 salary, both of these payments were several weeks late. He also noticed that some

of the payments were wired from the accounts of members of the Management Team. For these payments, Investor-Employee did not receive a pay stub and taxes were not deducted.

251.    Investor-Employee 15 did not receive all of his agreed upon compensation for his employment with the Downing Companies.

252.    On December 1, 2014, Investor-Employee 15 received a letter informing him that his healthcare plan was scheduled to be cancelled as a result of the Downing Companies' failure to pay the premium.

253.    Subsequently, Investor-Employee 15 was demoted to Vice President of Business Development.

254.    On August 25, 2015, Investor-Employee 15 sent a letter to Wagner and several members of the Management Team demanding payment for wages owed to him.

255.    On August 26, 2015, Investor-Employee 15 received a termination letter.

256.    Following his termination, Investor-Employee 15 received a promissory note and a nondisclosure agreement/general release.

**p. Investor-Employee 16**

257.    Investor-Employee 16, a Georgia resident, formerly served as the CTO for DDHG.

258.    In approximately May 2014, a member of the Management Team contacted Investor-Employee 16 and stated that in exchange for becoming an employee of the Downing Companies, Investor-Employee 16 would be required to invest $250,000 in Downing.

259.    Investor-Employee 16 was told that his position would include an annual salary of

$250,000.

260.    Investor-Employee 16 was also told that DDHG's stated strategy was to invest in early stage companies, help them grow, and sell the companies for a profit.

261.    On May 5, 2014, Investor-Employee 16 accepted the offer of employment and agreed to invest $250,000 in Downing. This $250,000 represented the majority of Investor-Employee 16's life savings.

262.    In return for Investor-Employee 16's investment, he was informed that he would hold an ownership position of 1.25% in Downing. Additionally, he was informed that he would have options, which upon vesting, would result in 1.0% ownership interest in Downing Digital.

263.    In approximately May 2014, Investor-Employee 16 wired $100,000 to Downing on the condition that the $100,000 would be returned within three months if Investor-Employee 16 was not satisfied.

264.    In approximately June or July 2014, Investor-Employee 16 attended a meeting in Nevada and learned that 3si had no product.

265.    On September 12, 2014, Investor-Employee 16 decided to exercise his option to have his investment returned. Investor-Employee 16 retained a lawyer to assist him. DDHG agreed to repay Investor 16 $25,000 per quarter worked in addition to a late fee.

q.    **Investor-Employee 17**

266.    Investor-Employee 17, a New Jersey resident, formerly served as the Vice President of Marketing for 3si.

267.    In approximately January 2014, a member of the Management Team contacted Investor-Employee 17 and stated that in exchange for becoming an employee of the

Downing Companies, Investor-Employee 17 would be required to invest $250,000.

268.    Investor-Employee 17 was offered an annual salary of $180,000 and was informed that she would be participating in the annual performance bonus program.

269.    On January 17, 2014, Investor-Employee 17 accepted the offer of employment and agreed to invest $250,000 in 3si.

270.    In return for Investor-Employee 17's $250,000 investment, she was told she would receive a convertible note, which when exercised, would result in a 2.5% ownership position of 3si. Further stock options made available to her would result in an additional 1.0% ownership position. This would result in a total ownership position of 3.5%.

### r.  Investor-Employee 18

271.    Investor-Employee 18, a Georgia resident, formerly served as the Vice President of Sales for 3si.

272.    In or about March 2014, a member of the Management Team contacted Investor-Employee 18 and stated that in exchange for becoming an employee of the Downing Companies, Investor-Employee 18 would be required to invest $250,000.

273.    Investor-Employee 18 was offered an annual salary of $160,000 and was informed that he would be participating in the annual performance bonus program.

274.    On March 28, 2014, Investor-Employee 18 accepted the offer of employment and agreed to invest $250,000 in 3si.

275.    In return for Investor-Employee 18's investment, he was told he would receive a convertible note, which when exercised, would result in a 2.5% ownership position of 3si. Further stock options made available to him would result in an additional 1.0%

ownership position. This would result in a total ownership position of 3.5%

### s. **Investor-Employee 19**

276.   Investor-Employee 19, a New Jersey resident, formerly served as the Vice President of Marketing for 3si.

277.   In approximately July 2015, a member of the Management Team contacted Investor-Employee 19 and stated that in exchange for becoming an employee of the Downing Companies, Investor-Employee 19 would be required to invest $150,000.

278.   Investor-Employee 19 was offered an annual salary of $195,000 and was informed that he would be participating in the annual performance bonus program.

279.   On July 24, 2015, Investor-Employee 19 accepted the offer of employment and agreed to invest $150,000 in 3si.

280.   In return for Investor-Employee 19's investment, he was told he would receive a convertible note, which when exercised, would result in a 0.5% ownership position of 3si. Further stock options made available to him would result in an additional 1.0% ownership position. This would result in a total ownership position of 1.5%.

### t. **Investor-Employee 20**

281.   Investor-Employee 20, a New Mexico resident, formerly served as the Chief Technology Officer for 3si.

282.   In approximately September 2014, a member of the Management Team contacted Investor-Employee 20 and stated that in exchange for becoming an employee of the Downing Companies, Investor-Employee 20 would be required to invest $250,000 in 3si.

283.   Investor-Employee 20 was offered an annual salary of $155,000 and was informed that he would be participating in the annual performance bonus program.

284.    On September 2, 2014, Investor-Employee 20 accepted the offer of employment and agreed to invest $250,000 in 3si.

285.    In return for Investor-Employee 20's $250,000 investment, he was told he would receive a convertible note, which when exercised, would result in a 1.0% ownership position in 3si. Further stock options made available to him would result in an additional 0.5% ownership position. This would result in a total ownership position of 1.5%

### u.  Investor Employee 21

286.    Investor-Employee 21, a Massachusetts resident, formerly served as the Executive Vice President of Northeast Sales for 3si.

287.    In approximately July 2014, a member of the Management Team contacted Investor-Employee 21 and stated that in exchange for becoming an employee of the Downing Companies, Investor-Employee 21 would be required to invest $250,000 in 3si.

288.    Investor-Employee 21 was offered an annual salary of $160,000 and was informed that he would be participating in the annual performance bonus program.

289.    On July 7, 2014, Investor-Employee 21 accepted the offer of employment and agreed to invest $250,000 in 3si.

290.    In return for Investor-Employee 21's $250,000 investment, he was told he would receive a convertible note, which when exercised, would result in a 1.0% ownership position in 3si. Further stock options made available to him would result in an additional 0.5% ownership position. This would result in a total ownership position of 1.5%

### v.  Investor-Employee 22

291.    Investor-Employee 22, an Ohio resident, formerly served as the Executive Vice President of Midwest Sales for 3si.

292.   In or about August 2014, a member of the Management Team contacted Investor-Employee 22 and stated that in exchange for becoming an employee of the Downing Companies, Investor-Employee 22 would be required to invest $250,000 in 3si.

293.   Investor-Employee 22 was offered an annual salary of $140,000 and was informed that he would be participating in the annual performance bonus program.

294.   On August 18, 2014, Investor-Employee 22 accepted the offer of employment and agreed to invest $250,000 in 3si.

295.   In return for Investor-Employee 22's $250,000 investment, he was told he would be offered stock options in 3si, which would provide him with 0.5% ownership.

### w.  Investor-Employee 23

296.   Investor-Employee 23, a Florida resident, formerly served as the Vice President of Sales for 3si.

297.   In approximately June 2014, a member of the Management Team contacted Investor-Employee 23 and stated that in exchange for becoming an employee of the Downing Companies, Investor-Employee 23 would be required to invest $250,000 in 3si.

298.   Investor-Employee 23 was offered an annual salary of $135,000 and was informed that he would be participating in the annual performance bonus program.

299.   On June 4, 2014, Investor-Employee 23 accepted the offer of employment and agreed to invest $250,000 in 3si.

300.   In return for Investor-Employee 23's $250,000 investment, he was told he would receive a convertible note, which when exercised, would result in a 1.0% ownership position in 3si. Further stock options made available to him would result in an additional 0.5% ownership position. This would result in a total ownership position of 1.5%.

### x. Investor-Employee 24

301. Investor-Employee 24, a South Carolina resident, formerly served as the Executive Vice President of Operations for 3si.

302. In or about October 2014, a member of the Management Team contacted Investor-Employee 24 and stated that in exchange for becoming an employee of the Downing Companies, Investor-Employee 24 would be required to invest $250,000 in 3si.

303. Investor-Employee 24 was offered an annual salary of $180,000 and was informed that he would be participating in the annual performance bonus program.

304. On October 4, 2014, Investor-Employee 24 accepted the offer of employment and agreed to invest $250,000 in 3si.

305. In return for Investor-Employee 24's $250,000 investment, he was told he would receive a convertible note, which when exercised, would result in a 1.0% ownership position in 3si. Further stock options made available to him would result in an additional 0.5% ownership position. This would result in a total ownership position of 1.5%.

### y. Investor-Employee 25

306. Investor-Employee 25, a Colorado resident, formerly served as the Vice President of Business Development, Southwest Region for DDHG.

307. In approximately January 2015, a member of the Management Team contacted Investor-Employee 25 and stated that in exchange for becoming an employee of the Downing Companies, Investor-Employee 25 would be required to invest $150,000 in DDHG.

308. Investor-Employee 25 was offered an annual salary of $175,000 and was

informed that she would be participating in the commission plan.

309.   On January 12, 2015, Investor-Employee 25 accepted the offer of employment and agreed to invest $150,000 in DDHG.

310.   In return for Investor-Employee 25's $150,000 investment, she was told she held an ownership position of 0.50% in DDHG. Further stock options made available to her would result in an additional 0.5% ownership position. This would result in a total ownership position of 1.0%.

**z.  Investor-Employee 26**

311.   Investor-Employee 26, an Ohio resident, formerly served as the Vice President of Business Development, Midwest Region for DDHG.

312.   In approximately January 2015, a member of the Management Team contacted Investor-Employee 26 and stated that in exchange for becoming an employee of the Downing Companies, Investor-Employee 26 would be required to invest $250,000 in DDHG.

313.   Investor-Employee 26 was offered an annual salary of $150,000 and was informed that he would be participating in the commission plan.

314.   On January 16, 2015, Investor-Employee 26 accepted the offer of employment and agreed to invest $250,000 in DDHG.

315.   In return for Investor-Employee 26's $250,000 investment, he was told he would have a 0.833% ownership position in DDHG. Further stock options made available to him would result in an additional 0.417% ownership position. This would result in a total ownership position of 1.25%.

**aa. Investor-Employee 27**

316.   Investor-Employee 27, a Florida resident, formerly served as the Vice President of Sales for DDHG.

317.   In approximately May 2015, a member of the Management Team contacted Investor-Employee 27 and stated that in exchange for becoming an employee of the Downing Companies, Investor-Employee 27 would be required to invest $250,000 in 3si.

318.   Investor-Employee 27 was offered an annual salary of $175,000 and was informed that he would be participating in the commission plan.

319.   On May 19, 2015, Investor-Employee 27 accepted the offer of employment and agreed to invest $250,000 in 3si.

320.   In return for Investor-Employee 27's $250,000 investment, he was told he would have an ownership position of 0.6943% in DDHG. Additionally, Investor-Employee 27 received a convertible note, which when exercised, would result in a .7985% ownership position in DDHG. Further stock options made available to him would result in a total ownership position of 1.769%.

**bb. Investor-Employee 28**

321.   Investor-Employee 28, a Colorado resident, formerly served as the Vice President Business Development, Rocky Mountain Region Sales for DHT.

322.   In approximately May 2015, a member of the Management Team contacted Investor-Employee 28 and stated that in exchange for becoming an employee of the Downing Companies, Investor-Employee 28 would be required to invest $250,000 in DHT.

323.   Investor-Employee 28 was offered an annual salary of $150,000 and was informed that he would be participating in the commission plan.

324.    On May 5, 2015, Investor-Employee 28 accepted the offer of employment and agreed to invest $250,000 in DHT.

325.    In return for Investor-Employee 28's $250,000 investment, he was told he would hold a .83% ownership position in DHT. Further stock options made available to him would result in an additional 0.5% ownership position. This would result in a total ownership position of 1.33%.

### cc. Investor-Employee 29

326.    Investor-Employee 29, a Connecticut resident, formerly served as the Vice President of Development, North East Region for DHT.

327.    In approximately March 2015, a member of the Management Team contacted Investor-Employee 29 and stated that in exchange for becoming an employee of the Downing Companies, Investor-Employee 29 would be required to invest $250,000 in DHT.

328.    Investor-Employee 29 was offered an annual salary of $145,000 and was informed that he would be participating in the commission plan.

329.    On March 13, 2015, Investor-Employee 29 accepted the offer of employment and agreed to invest $250,000 in DHT.

330.    In return for Investor-Employee 29's $250,000 investment, he was told he would hold a 0.833% ownership interest in DHT. Further stock options made available to him would result in an additional 0.25% ownership position. This would result in a total ownership position of 1.083%.

### dd. Investor-Employee 30

331.    Investor-Employee 30, an Illinois resident, formerly served as the Vice President,

Business Development for DMDG.

332.    In approximately October 2014, a member of the Management Team contacted Investor-Employee 30 and stated that in exchange for becoming an employee of the Downing Companies, Investor-Employee 30 would be required to invest $250,000 in DMDG.

333.    Investor-Employee 30 was offered an annual salary of $200,000 and was informed that he would be participating in the annual performance and commissions programs.

334.    On October 1, 2014, Investor-Employee 30 accepted the offer of employment and agreed to invest $250,000 in DMDG

335.    In return for Investor-Employee 30's $250,000 investment, he was told he would hold a 0.833% ownership interest in DMDG. Further stock options made available to him would result in an additional 0.833% ownership position. This would result in a total ownership position of approximately 1.67%.

**ee. Investor-Employee 31**

336.    Investor-Employee 31, a North Carolina resident, formerly served as Vice President of Business Development, Southeast Region for DDHG.

337.    In approximately August 2014, a member of the Management Team contacted Investor-Employee 31 and stated that in exchange for becoming an employee of the Downing Companies, Investor-Employee 31 would be required to invest $250,000 in DDHG.

338.    Investor-Employee 31 was offered an annual salary of $170,000 and was informed that he would be participating in the commission plan.

339.   On August 24, 2014, Investor-Employee 31 accepted the offer of employment and agreed to invest $250,000 in DDHG.

340.   In return for Investor-Employee 31's $250,000 investment, he was told he would hold a 0.833% ownership interest in DDDHG.

### ff. Investor-Employee 32

341.   Investor-Employee 32, a New York resident, formerly served as the Vice President Business Development Officer of DMDG.

342.   In approximately March 2015, a member of the Management Team contacted Investor-Employee 32 and stated that in exchange for becoming an employee of the Downing Companies, Investor-Employee 32 would be required to invest $250,000 in DHT.

343.   Investor-Employee 32 was offered an annual salary of $145,000 and was informed that he would be participating in the commission plan.

344.   On March 20, 2015, Investor-Employee 32 accepted the offer of employment and agreed to invest $250,000 in DHT.

345.   In return for Investor-Employee 32's $250,000 investment, he was told he held a 0.833% ownership interest in DHT. Further stock options made available to him would result in an additional 0.25% ownership position. This would result in a total ownership position of approximately 1.083%.

### gg. Investor-Employee 33

346.   Investor-Employee 33, a Connecticut resident, formerly served as the Vice President Business Development, Northeast Region of DDHG.

347.   In approximately February 2015, a member of the Management Team contacted

Investor-Employee 33 and stated that in exchange for becoming an employee of the Downing Companies, Investor-Employee 33 would be required to invest $150,000 in DDHG.

348.    Investor-Employee 33 was offered an annual salary of $150,000 and was informed that he would be participating in the commission plan.

349.    On February 18, 2015, Investor-Employee 33 accepted the offer of employment and agreed to invest $150,000 in DDHG.

350.    In return for Investor-Employee 33's $150,000 investment, he would hold a 0.50% ownership interest in DDHG. Further stock options made available to him would result in an additional 0.55% ownership position. This would result in a total ownership position of approximately 1.05%.

**hh. Investor-Employee 34**

351.    Investor-Employee 34, a Georgia resident, formerly served as the President and COO of DHT.

352.    In approximately July 2015, a member of the Management Team contacted Investor-Employee 34 and stated that in exchange for becoming an employee of the Downing Companies, Investor-Employee 34 would be required to invest $250,000 in DHT.

353.    Investor-Employee 34 was offered an annual salary of $250,000 and was informed that he would be participating in the annual performance program.

354.    On July 20, 2015, Investor-Employee 34 accepted the offer of employment and agreed to invest $250,000 in DHT.

355.    In return for Investor-Employee 34's $250,000 investment, he was told he would

hold a 0.6943% ownership interest in DHT. Investor-Employee 34 was also offered a warrant resulting in an additional 0.7985% ownership interest. Further stock options made available to him would result in an additional 3.0% ownership position. This would result in a total ownership position of approximately 4.4928%.

### ii. Investor-Employee 35

356.    Investor-Employee 35, a New York resident, formerly served as the Chief Information Officer of DDHG.

357.    In approximately October 2014, a member of the Management Team contacted Investor-Employee 35 and stated that in exchange for becoming an employee of the Downing Companies, Investor-Employee 35 would be required to invest $250,000 in DDHG.

358.    Investor-Employee 35 was offered an annual salary of $200,000 and was informed that he would be participating in the commission plan.

359.    On March 20, 2015, Investor-Employee 35 accepted the offer of employment and agreed to invest $250,000 in DDHG.

360.    In return for Investor-Employee 35's $250,000 investment, he was told he would hold a 0.83% ownership interest in DDHG. Further stock options made available to him would result in an additional 1.0% ownership position. This would result in a total ownership position of approximately 1.83%.

### jj. Investor-Employee 36

361.    Investor-Employee 36, a New York resident, formerly served as the Chief Information Officer of DDHG.

362.    In approximately October 2014, a member of the Management Team contacted

Investor-Employee 36 and stated that in exchange for becoming an employee of the Downing Companies, Investor-Employee 36 would be required to invest $250,000 in DDHG.

363.    On March 20, 2015, Investor-Employee 36 accepted the offer of employment and agreed to invest $250,000 in DDHG.

364.    In return for Investor-Employee 36's $250,000 investment, he was told he would hold a 0.83% ownership interest in DDHG. Further stock options made available to him would result in an additional 1.0% ownership position. This would result in a total ownership position of approximately 1.83%.

### kk. Investor-Employee 37

365.    Investor-Employee 37, a Georgia resident, formerly served as the Vice President Business Development, Southeast Region of DDHG.

366.    In approximately November 2014, a member of the Management Team contacted Investor-Employee 37 and stated that in exchange for becoming an employee of the Downing Companies, Investor-Employee 37 would be required to invest $150,000 in DDHG.

367.    Investor-Employee 37 was offered an annual salary of $150,000 and was informed that he would be participating in the commission plan.

368.    On November 25, 2014, Investor-Employee 37 accepted the offer of employment and agreed to invest $150,000 in DDHG.

369.    In return for Investor-Employee 37's $150,000 investment, he was told he would hold a 0.50% ownership interest in DDHG. Further stock options made available to him would result in an additional 0.50% ownership position. Investor-Employee 37's

Employment Agreement states he was eligible for a total ownership position of approximately 1.33%.

### ll. Investor-Employee 38

370.    Investor-Employee 38, a Pennsylvania resident, formerly served as the Senior Vice President of Corporate Development for Downing.

371.    In approximately September 2015, a member of the Management Team contacted Investor-Employee 38 and stated that in exchange for becoming an employee of the Downing Companies, Investor-Employee 38 would be required to invest $200,000 in Downing Investment Partners.

372.    Investor-Employee 38 was offered an annual salary of $215,000 and was informed that he would be participating in the annual performance bonus program.

373.    On September 16, 2015, Investor-Employee 38 accepted the offer of employment and agreed to invest $200,000 in Downing Investment Partners.

374.    In return for Investor-Employee 38's $200,000 investment, he was told he would hold a 0.83% ownership interest in Downing Investment Partners. Further stock options made available to him would result in an additional 1.50% ownership position. This would result in a total ownership position of approximately 1.00%.

### mm.    Investor-Employee 39

375.    Investor-Employee 39, a New Jersey resident, formerly served as the President & GM of Downing.

376.    In or about April 2015, a member of the Management Team contacted Investor-Employee 39 and stated that in exchange for becoming an employee of the Downing Companies, Investor-Employee 39 would be required to invest $200,000 in Downing

Investment Partners.

377.   Investor-Employee 39 was offered an annual salary of $250,000 and was informed that he would be participating in the annual performance bonus program.

378.   On April 29, 2015, Investor-Employee 39 accepted the offer of employment and agreed to invest $200,000 in Downing Investment Partners.

379.   In return for Investor-Employee 39's $200,000 investment, he was told he would hold a 0.83% ownership interest in Downing Investment Partners. Further stock options made available to him would result in an additional 1.50% ownership position. This would result in a total ownership position of approximately 1.00%.

### nn. Investor-Employee 40

380.   Investor-Employee 40 formerly served as the Chief Operating Officer of Downing Investment Partners.

381.   In approximately July 2014, a member of the Management Team contacted Investor-Employee 40 and stated that in exchange for becoming an employee of the Downing Companies, Investor-Employee 40 would be required to invest $150,000 in Downing Investment Partners and $100,000 in DDHG.

382.   Investor-Employee 40 was offered an annual salary of $250,000 and was informed that he would be participating in performance bonus program.

383.   On July 10, 2014, Investor-Employee 40 accepted the offer of employment and agreed to invest $150,000 in Downing Investment Partners and $100,000 in DDHG.

384.   In return for Investor-Employee 40's $250,000 investment, he was told he would hold a 0.75% ownership interest in Downing Investment Partners and a 0.33% ownership position in DDHG. Further stock options made available to him would result in an

additional .42% ownership position in Downing Investment Partners and an additional .42% ownership position in DDHG.

### oo. Investor-Employee 41

385.    Investor-Employee 41, a Texas resident, formerly served as the Senior Vice President of Clinical and Regulatory Affairs and Quality Assurance for Downing Investment Partners.

386.    In approximately September 2014, a member of the Management Team contacted Investor-Employee 41 and stated that in exchange for becoming an employee of the Downing Companies, Investor-Employee 41 would be required to invest $250,000 in Downing Investment Partners.

387.    Investor-Employee 41 was offered an annual salary of $200,000 and was informed that he would be participating in the performance bonus program.

388.    On September 25, 2014, Investor-Employee 41 accepted the offer of employment and agreed to invest $250,000 in Downing Investment Partners.

389.    In return for Investor-Employee 41's $250,000 investment, he was told he would hold a 1.25% ownership interest in Downing Investment Partners. Further stock options made available to him would result in an additional 1.25% ownership position. This would result in a total ownership position of approximately 2.50%.

### pp. Investor-Employee 42

390.    Investor-Employee 42, a California resident, formerly served as the Chief Strategy Officer for IVC Healthcom.

391.    In approximately May 2015, a member of the Management Team contacted Investor-Employee 42 and stated that in exchange for becoming an employee of the

Downing Companies, Investor-Employee 42 would be required to invest $250,000 in Downing Investment Partners.

392.    Investor-Employee 42 was offered an annual salary of $175,000 and was informed that he would be participating in the performance bonus program.

393.    On May 11, 2015, Investor-Employee 42 accepted the offer of employment and agreed to invest $250,000 in IVC Healthcom.

394.    In return for Investor-Employee 42's $250,000 investment, he was told he would hold a 2.0% ownership interest in IVC Healthcom. Further stock options made available to him would result in an additional 2.0% ownership position in IVC Healthcom.

395.    At least 42 Investor-Employees invested in the Downing Companies.    These Investor-Employees relied upon Respondents' misrepresentations and omissions of material information to make investments in the Downing Companies and associated entities. These Investor-Employees were led to believe that their initial investment in the Downing Companies would result in greater profits.

## VIII.    VIOLATIONS OF LAW

396.    Section 101 of the Act provides:

It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly

(1) to employ any device, scheme, or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

MASS. GEN. LAWS ch. 110A, § 101.

397.    The Enforcement Section herein re-alleges and restates the allegations of fact set

forth in Section VII above.

398.    The conduct of Respondents, as described above, constitutes violations of MASS.

GEN. LAWS ch. 110A, § 101.

### IX.    STATUTORY BASIS FOR RELIEF

Section 407A of the Act provides, in pertinent part:

> (a) If the secretary determines, after notice and opportunity for hearing,
> that any person has engaged in or is about to engage in any act or practice
> constituting a violation of any provision of this chapter or any rule or
> order issued thereunder, he may order such person to cease and desist
> from such unlawful act or practice and may take such affirmative action,
> including the imposition of an administrative fine, the issuance of an order
> for an accounting, disgorgement or rescission or any other such relief as in
> his judgment may be necessary to carry out the purposes of [the Act].

MASS. GEN. LAWS ch. 110A, § 407A.

### X.  PUBLIC INTEREST

For any and all of the reasons set forth above, it is in the public interest and will

protect Massachusetts investors for the Director to enter an order finding that such

"action is necessary or appropriate in the public interest or for the protection of investors

and consistent with the purposes fairly intended by the policy and provisions of this

chapter [MASS. GEN. LAWS ch. 110A]."

### XI.    RELIEF REQUESTED

The Enforcement Section of the Division requests that an order be entered:

A.  Finding as fact all allegations set forth in Section VII of the Complaint;

B.  Finding that all the sanctions and remedies detailed herein are in the public interest

and necessary for the protection of Massachusetts investors;

C.  Requiring Respondents to permanently cease and desist from further conduct in

violation of the Act and Regulations;

D.  Censuring Respondents;

E.  Requiring Respondents to provide a verified accounting of those losses attributable to
the alleged wrongdoing;

F.  Requiring Respondents to provide restitution to fairly compensate investors for those
losses attributable to the alleged wrongdoing;

G.  Requiring Respondents to make rescission offers to all residents of the
Commonwealth who purchased securities sold in violation of the Act;

H.  Requiring Respondents to disgorge all profits, direct or indirect compensation, and
remuneration received in connection with the alleged wrongdoing;

I.  Imposing an administrative fine on Respondents in such amount and upon such terms
and conditions as the Director or Presiding Officer may determine; and

J.  Taking any such further action which may be in the public interest and necessary and
appropriate for the protection of Massachusetts investors.

**MASSACHUSETTS SECURITIES DIVISION
ENFORCEMENT SECTION**

By and through its attorneys,

Lucinda Rivera, Esq.
Kimiko K. Butcher, Esq.
Patrick M. Costello, Esq.
Massachusetts Securities Division
One Ashburton Place, Room 1701
Boston, Massachusetts 02108-1552
tel. (617) 727-3548
fax. (617) 248-0177

Dated:  June 14, 2019

58

**COMMONWEALTH OF MASSACHUSETTS**
**OFFICE OF THE SECRETARY OF THE COMMONWEALTH**
**SECURITIES DIVISION**
**ONE ASHBURTON PLACE, ROOM 1701**
**BOSTON, MASSACHUSETTS  02108**

IN THE MATTER OF:                                   )
                                                    )
                                                    )
DOWNING PARTNERS, LLC,                              )
DOWNING INVESTMENT PARTNERS, LP,                    )
DOWNING HEALTH TECHNOLOGIES, LLC, f/k/a )    Docket No. E-2015-0171
DOWNING DIGITAL HEALTHCARE GROUP,        )
IVC HEALTHCOM, LLC,                                )
3SI INTERNATIONAL, LLC,                            )
SURGICAL SAFETY SOLUTIONS, LLC,                    )
DOWNING MEDICAL DEVICE GROUP, LLC, and )
DAVID W. WAGNER,                                   )
                                                    )
          RESPONDENTS.                             )

**CERTIFICATE OF SERVICE**

        I hereby certify that on June 14, 2019, I caused a true and accurate copy of the attached Administrative Complaint to be submitted for service to the following parties in the manner set out below:

David W. Wagner                          Downing Partners LLC
55 Downing Street,                       Downing Investment Partners, LP
East Greenwich, RI 02818                 Downing Health Technologies, LLC
                                         IVC Healthcom, LLC
Downing Partners LLC                     3si International, LLC
Downing Investment Partners, LP          Surgical Safety Solutions, LLC
Downing Health Technologies, LLC         Downing Medical Device Group, LLC
IVC Healthcom, LLC                       1350 Division Road
3si International, LLC                    Third Floor
Surgical Safety Solutions, LLC           West Warwick, RI 02893
Downing Medical Device Group, LLC        *(via first class and certified mail)*
c/o David W. Wagner
55 Downing Street
East Greenwich, RI 02818
*(via first class and certified mail)*

_____
Lucinda Rivera, Esq.
Enforcement Section